1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10

KELLY LAVINO,                        )        CV 10-3623 SVW (FMOx)
11                                    )
                   Plaintiff,         )
12                                    )
              v.                      )        FINDINGS OF FACT AND
13                                    )        CONCLUSIONS OF LAW
METROPOLITAN LIFE INSURANCE           )
14  COMPANY; MALCOLM PIRNIE WELFARE    )        [JS-6]
BENEFIT PLAN,                        )
15                                    )
                   Defendants.        )
16  _____  )

17

18

19

20

21

22  **I.    Introduction**

23        Plaintiff Kelly Lavino filed this suit seeking ERISA-governed

24  long-term disability benefits from Defendant Metropolitan Life

25  Insurance Company ("MetLife") under her Malcolm Pirnie Welfare Benefit

26  Plan ("the Plan"). On January 13, 2010, this Court issued a Findings of

27  Fact and Conclusions of Law in a related matter, Lavino v. Metropolitan

28  Life Insurance Company, CV 08-2910 SVW (FMCx), 2010 WL 234817 (C.D.

Cal. Jan. 13, 2010) (hereinafter, "Lavino I"), and issued judgement thereon on January 19, 2010 (collectively, "the January Order"). The January Order found that MetLife had abused its discretion in prematurely terminating Lavino's benefits under the policy's "own occupation" standard of disability. The Court ordered MetLife to review Lavino's eligibility for continuing benefits under the policy's "any occupation" standard. The Court also ordered MetLife to assess whether the proper benefit percentage to which Lavino is due is 60% or 70% of her former earnings. The parties have since agreed that 70% is the appropriate percentage, although it is unclear whether MetLife has actually transmitted the 10% balance to Plaintiff. (Def. Trial Brief, Docket no. 23, at 24).

Following numerous delays in rendering a decision, MetLife has since determined that Lavino suffers from a psychiatric disability that prevents her from working, thus entitling her to two years of benefits under the "any occupation" standard pursuant to the Plan. MetLife denies that Lavino has a physical disability that would warrant continuing benefits thereafter. Lavino argues that her disability is physical in nature, not psychiatric, and that her benefit entitlement should not be restricted to two years. Having conducted a bench trial on January 4, 2011, the Court now makes the following Findings of Facts and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons stated herein, the Court finds that MetLife abused its discretion in determining that Lavino's disability was psychiatric in nature, and not physical.

//

//

## II.   Relevant Background Facts

### A.   The Events Leading Up to <u>Lavino I</u>

The Court will not exhaustively repeat the contents of the administrative record relied upon or the legal reasoning analyzed in <u>Lavino I</u> here. In brief, Lavino worked as a project engineer for Malcom Pirnie, Inc. ("Malcom Pirnie"). As an employee of Malcom Pirnie, Lavino was covered under a long-term disability plan issued by MetLife. The Plan defines "Disabled" as follows:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
> 1. during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
> 2. after the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

(Administrative record [hereinafter, "AR"] 563). With regard to psychiatric disabilities, the Plan provides:

> Monthly benefits are limited to 24 months during your lifetime if you are Disabled due to a Mental or Nervous Disorder or Disease, unless the Disability results from:
> 1. schizophrenia;
> 2. bipolar disorder;
> 3. dementia; or
> 4. organic brain disease.

(AR 576). Importantly, the Plan granted MetLife discretionary authority in making benefits determinations. The relevant portion with regard to discretion provides:

> In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the

Plan and to determine eligibility for an entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(AR 597).

In early 2006, Lavino ceased working and began to receive short- and long-term disability benefits from MetLife. MetLife approved Lavino's claim for long-term disability benefits on March 12, 2007 due to physical disability stemming from her fibromyalgia. It is undisputed that Lavino suffered then and continues to suffer from fibromyalgia. However, MetLife terminated her benefits on January 7, 2008, two months before her "own occupation" benefits were set to expire. MetLife determined that "the medical information contained in [Plaintiff's] file does not support a severity of a condition that would prevent [Plaintiff] from performing the essential duties of [her] job." Lavino I, 2010 WL 234817 at *5. Following an administrative appeal, MetLife upheld the denial of Lavino's benefits on February 27, 2008, which prompted Lavino to file her first lawsuit, Lavino I.

The Court reviewed the administrative record and determined that MetLife had abused its discretion in terminating Lavino's benefits. The Court noted conflicts of interests on the part of the doctors selected by MetLife to review Lavino's claim, failures to ask Lavino for necessary evidence, and inconsistencies in classifying Lavino's job as relevant factors in reviewing MetLife's decision with skepticism. The Court accordingly ordered MetLife to reinstate Lavino's "own occupation" benefits and remanded the matter for MetLife to review Lavino's eligibility for continuing benefits under the Plan's "any

4

occupation" standard. Id. at *14. The Court's January Order was a determination that Lavino had a physical disability in January 2008 stemming from her fibromyalgia.

**B.   Procedural Irregularities in Reaching the Benefits Decision**

The facts in dispute in this case occurred subsequent to the January Order. At the time of the January Order, MetLife was in possession of all of Lavino's relevant medical records spanning from the claim's inception in 2006 through September 2008. On February 22, 2010, Lavino forwarded 82 pages of additional information for MetLife's review that consisted of a social security award finding Lavino disabled and unable to perform any work effective January 2006, Lavino's updated examination notes from her long-term treating physician and her rheumatologist, and other relevant information. The records were received by MetLife on February 26. On March 11, MetLife disability analyst Paul Baechle informed Lavino that he wished to interview her and that he might also require Lavino to be interviewed by a MetLife nurse. Baechle interviewed Lavino on March 17. Baechle advised Lavino that he would decide if a further interview was necessary with MetLife nurse, Michelle Haas.

On March 23, Lavino's attorney, Tracy Collins, spoke with Haas, who informed Collins that a further interview may not be necessary because the medical record could be sufficient to render a claim. Haas advised Collins that she would speak with Baechle and would request a further interview only if necessary. On March 23, Lavino also faxed MetLife Dr. Flaningam's most recent progress note dated March 15, 2010. On both April 1 and April 12, Collins called Baechle to determine the status of the decision, at which time Baechle informed Collins that a

decision had not been made and offered no time frame for a decision. Baechle informed Collins on April 12 that MetLife did not intend to conduct a further medical review. However, on April 13, Collins was informed by Erin Cornell, MetLife's counsel, that MetLife desired to conduct an independent medical examination ("IME") of Lavino and that MetLife would shortly be sending Collins a letter about the proposed examination. Collins responded on April 15 requesting more information regarding the IME.

On April 19, Collins again emailed Cornell to inquire about the IME because she had not yet received additional instructions from MetLife. She also informed MetLife that the deadline for issuing a decision on Lavino's claim had passed. On April 30, having still received no information from MetLife regarding the decision or the IME, Collins sent another letter informing them that they had failed to render a timely decision on the claim and that she would file suit if a decision was not made by May 5. Receiving no word from MetLife, Collins filed this suit on May 17.

In failing to reach a timely decision, MetLife violated the procedures set forth in the Plan. In relevant part, the Plan's terms provide as follows:

> After you submit a claim for disability benefits to MetLife, MetLife will review your claim and notify you of its decision to approve or deny your claim.
>
> Such **notification will be provided to you within a reasonable period not to exceed 45 days from the date you submitted your claim**; except for situations requiring an extension of time because of matters beyond the control of the Plan, in which case MetLife may have up to two (2) additional extensions of 30 days each to provide you such notification. **If MetLife needs an extension, it will notify you prior to the expiration of the initial 45 day period . . . , state the reason why the extension is needed, and state when it will make its determination.** If an extension is needed because you

did not provide sufficient information or filed an incomplete
claim, the time from the date of MetLife's notice requesting
further information and an extension until MetLife receives
the requested information does not count toward the time
period MetLife is allowed to notify you as to its claims
decision.

(AR 72) (emphasis added). This 45-day window for disability claims is also mandated by 29 C.F.R. § 2560.503-1(i)(3)(i).

In determining that MetLife violated the Plan's deadline for reaching a benefits decision, the Court must first determine at what point the review period began. As discussed, both the Plan and the Code of Federal Regulations require that a benefits decision be reached within 45 days. There is an adequate basis for finding that the review period began on the date that this Court first issued its January Order. At that time, MetLife was already in possession of Lavino's medical records through September 2008 and thus was amply situated to assess her eligibility for additional benefits as of March 2008, which was when her "any occupation" benefits should have begun. However, even assuming that MetLife was entitled to Lavino's updated medical records before rendering a decision, these records were in MetLife's possession as of February 26, and the 45-day review period began to run at that point at the latest.[1]

---

[1] MetLife contends that March 23 should be the relevant start date for calculating the decision because "Each time plaintiff submitted additional information in support of her claim, the deadline for MetLife to make its claim determination was extended." (Def. Trial Brief at 21). This contention is meritless. As explained in Tomassi v. Prudential, 2007 WL 1772117, at *4 (N.D. Ill. June 19, 2007), "Restarting [an administrator's] clock every time a claimant submits [additional information] would in many situations give [an administrator] an endless amount of time to consider appeals." On February 26, MetLife possessed sufficient information to begin its claim decision, and there was no valid excuse for its delay in seeking additional information. MetLife seemingly concedes this point, stating, "Following receipt of Lavino's February 22, 2010 submission, MetLife began its investigation into whether Lavino met

MetLife's subsequent request that Lavino undergo an IME does not affect this determination. MetLife's medical examination request was not made until April 13, three days after it was required to make a decision. This oral indication of an **intent** to conduct a medical examination could not trigger an extension under the Plan's terms, which required MetLife to "state the reason why the extension is needed, and state when it will make its determination." (AR 72). MetLife's oral notice was procedurally defficient.

Courts have established that a plan administrator's request to conduct such an IME does not toll the deadline to render a claim decision when, as here, it is not communicated in a timely fashion. <u>See Tomassi</u>, 2007 WL 1772117 at *6 n.12 ("Prudential's argument under 28 C.F.R. § 2560.503-1(i)(4) that Tomassi's failure to submit to the requested psychiatric evaluation tolled the period for Prudential to complete its review is unavailing because the period had already expired."); <u>Kowalski v. Farella, Braun, & Martel LLP</u>, 2007 WL 1342475, at *4 n.2 (N.D. Cal. May 7, 2007) ("Even assuming defendants were entitled to require an IME of plaintiff for purposes of determining the merits of plaintiff's appeal, defendants failed to seek an IME in a timely manner. As discussed, defendants were not entitled to tolling based on the request for an IME . . . ."); <u>Sidou v. Unumprovident Corp.</u>, 245 F.Supp.2d 207, 216 (D.Me. 2003) ("[I]t is simply unreasonable to request that a claimant submit to medical examinations *after* the applicable deadline for ruling on her appeal has expired when

the Plan's terms and conditions and was entitled to LTD benefits under the 'any occupation' definition of disability." (Def. Trial Brief at 7). The only additional information supplied on March 23 was Dr. Flaningam's most recent progress note from that month.

the sole reason for the independent medical examination can only be to supplement a final decision that has already been made.") (emphasis in original).

MetLife contends that because of the Court's January Order, the deadlines imposed by the Plan and the regulations should not apply. In the absence of an explicit statement otherwise, there is no basis for MetLife to believe that the timeliness window in the Plan and the applicable regulations were inapplicable

Nonetheless, at a hearing held on September 28, 2010, which was the date originally scheduled for trial in this matter, the Court ordered Lavino to submit to an IME and remanded the matter for MetLife to reach a benefits decision (the "September Order"). The Court ordered the examination and the subsequent doctor's report to be completed no later than October 29, 2010. [Docket no. 24]. The Court further ordered MetLife to provide Lavino with a curriculum vitae of the doctor conducting the IME and to describe the nature of its relationship with the doctor. Finally, MetLife was ordered to render a decision as to Lavino's benefits within twenty days of the release of the IME report. Implicit in this order was that MetLife should timely inform Plaintiff of its decision and the basis for that decision. MetLife again failed to meet its deadlines.

An IME was conducted on October 12, 2010 by Dr. Douglas Haselwood, a rheumatologist. Dr. Haselwood was retained by MLS National Medical Evaluation Services ("MLS"), which is a third party vendor that performs disability reviews for insurers. (Collins Decl. Exh. 11). MetLife informed Lavino that Dr. Haselwood had not conducted an IME for MetLife before. It did not reveal the details of its previous

relationship with MLS, maintaining that Court's September Order required only disclosure as to its relationship with the specific doctor chosen, and not the organization that retained him. At the insistence of Lavino, however, MetLife later disclosed that it had first hired MLS in 2009 and that MLS had performed 77 examinations for MetLife between 2009 and September 2010, for which MetLife had paid $118,816.25. (Collins Decl. Exh. 13 at 2).

Dr. Haselwood concluded that Lavino could perform light work, which would render her ineligible for continuing "own occupation" benefits. He also suggested a psychiatric review. The merits of Dr. Haselwood's findings are discussed *infra*. Of note here, however, is the fact that MetLife provided Dr. Haselwood with the reports of the prior reviewers that the Court had rejected in Lavino I. Dr. Haselwood memorialized and seemingly adopted many of those reviewers' findings. (AR 832). See Morgan v. Prudential, 2010 WL 4665951, at *7 (E.D.Pa. Nov. 18, 2010) (rejecting conclusions of administrator's examiner in part because a doctor was provided with prior adverse reviews by other retained reviewers, thereby rendering his opinion lacking in independence). These reports would be of little help to Dr. Haselwood since those reviewers did not physically examined Lavino. Dr. Haselwood was in position to review the same files, which had been significantly supplemented since Lavino I, on his own.

Dr. Haselwood's report was provided to Collins on October 22, 2010. Pursuant to the Court's September Order, MetLife's decision was due on November 11, 2010. Yet, it was not until November 16, 2010 that MetLife informed Collins of its need to conduct a psychiatric review. MetLife contended that the need to conduct this additional review

justified its delay in rendering a decision. MetLife further indicated its intention to approve only two years of benefits for Lavino based on the policy provision limiting the duration of benefits payments for psychiatric disabilities. MetLife's counsel informed Collins that she would receive MetLife's letter confirming its decision "shortly." (Collins Decl. Exh. 3, Docket no. 32).

The psychiatric review was conducted in-house by a MetLife Psychiatric Clinical Specialist. (Def. Supp. Trial Brief at 6). The Administrate Record does not reveal who this clinician actually was. The entry in MetLife's "claim activity log" for Lavino states that the psychiatric review *entry* was completed by Paul Baechle, the aforementioned MetLife disability analyst, but whether Baechle conducted the psychiatric review is unclear. MetLife's attorney was unable to identify the clinician or what level of that clinician had; nor could counsel clarify whether a clinician would even be a psychologist or psychiatrist. The most reasonable inference from the record is that the anonymous clinician was not a doctor. Notably, the entry for the actual psychiatric determination includes a "scheduled date" of November 17, 2010 and a "completed date" or November 18, 2010 which calls into question whether the clinician's report was even conducted prior to MetLife having advised Lavino on November 16, 2010 of its decision. (AR 809). The clinician conducted her review without interviewing Lavino.

Lavino's counsel notified MetLife on several occasions that she had not received MetLife's formal, written decision on the date ordered by the Court, and so advised the Court on both November 23, 2010 and December 1, 2010. [Docket nos. 25, 26]. MetLife's written decision,

11

which was dated December 2, was finally received by Plaintiff on December 3, 2010. (AR 821-826). This was 22 days after the Court ordered MetLife to make its decision. The psychiatric review that formed the basis for the decision was not transmitted to Plaintiff until December 7, 2010, four days later.

The last procedural irregularity on the part of MetLife was a failure to adequately address Lavino's social security award. "While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'" Montour v. Hartford Life & Acc. Ins. Co., 588 F.3d 623, 635 (9th Cir. 2009) (quoting Glenn v. MetLife, 461 F.3d 660, 674 (6th Cir. 2006)). Neither the psychiatric clinician report nor Dr. Haselwood's report directly address Lavino's social security award, which was granted on account of her fibromyalgia. Only MetLife's actual decision letter acknowledges the existence of Lavino's social security award; however, it does not disclose whether the social security award was considered, by whom, or the basis for MetLife's disagreement. Rather, MetLife's letter baldly states that "we also took into consideration her Social Security Disability Income (SSDI) benefits award" but distinguished it because the "Social Security Administration (SSA) determination is separate from and governed by different standards than MetLife's review and determination under the plan." (AR 825).

**C.   Conflicts of Interest**

As noted in Lavino I, here, MetLife has a structural conflict of

interest: it both decides who gets benefits and pays for them. See Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 868 (9th Cir. 2008). It therefore has a direct financial incentive to deny claims. The implications of this conflict of interest are discussed in greater detail *infra*. The Court notes here, however, that MetLife has not demonstrated any attempt to "take[] active steps to reduce its potential bias and to promote accuracy, for example by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 112 (2008). The only act resembling such an "active step" was the retention of an independent doctor to conduct an IME of Lavino. However, that IME was not conducted in accordance with plan procedures, as discussed, and was ultimately conducted only pursuant to a court order.

Lavino argues that the fact that Lavino's IME was conducted by a doctor affiliated with MLS should raise further conflict of interest concerns. As noted, MLS performed 77 examinations for MetLife between 2009 and September 2010, for which MetLife had paid $118,816.25. (Collins Decl. Exh. 13 at 2). However, statistics about relationships between administrators and third party vendors "standing alone [are not] probative of any bias on the part of [a third party vendor] in its handling of claims." Nolan v. Heald College, – F.Supp.2d –, 2010 WL 1837805 (N.D. Cal. 2010). Dr. Haselwood himself had never conducted an IME for MetLife, and Lavino has not presented any evidence indicating that MLS has historically demonstrated a bias in favor of MetLife. See also Dilley v. Metropolitan Life Ins. Co., 256 F.R.D. 643, 645 (N.D.

Cal. 2009) ("Details of the number of claims denied based on a medical records review by NMR would be meaningless unless a finding could be made that MetLife had wrongly denied those claims."); Kludka v. Qwest Disability Plan, 2010 WL 1408895, at *7 (D. Ariz. Apr. 7, 2010) (requiring evidence "that the doctors hired by [reviewer] receive additional money if they deny claims or that [reviewer] stops hiring doctors who frequently grant claims"). The fact that Lavino's psychiatric review was conducted by a MetLife employee gives the Court greater concern. The in-house clinician cannot be considered "independent."

**III.     Standard of Review**

     If a plan unambiguously gives the plan administrator discretion to determine a plan participant's eligibility for benefits, as here, then the appropriate standard of review shifts is an abuse of discretion standard. Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006); Saffon, 522 F.3d at 866. However, the abuse of discretion standard may be tempered by a degree of skepticism if there are indications of improprieties on the part of an administrator, such as conflicts of interest or procedural irregularities.[2] Abatie, 458 F.3d at 959, 972.

     As to structural conflicts of interest, it is frequently the case that "the same entity that funds an ERISA benefits plan also evaluates claims, as is the case here." Montour v. Hartford Life & Acc. Ins. Co., 588 F.3d 623, 631 (9th Cir. 2009) (citing Metro. Life Ins. Co. v.

---

     [2] This Court found precisely these sorts of improprieties on the part of MetLife in their previous dealings with Lavino in its January Order and again here as outlined above.

14

*Glenn*, 554 U.S. 105, 112 (2008)). The Ninth Circuit has instructed that the "level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history." *Abatie*, 458 F.3d at 968. On the other hand, however, a court also may weigh a conflict more heavily if: the administrator provides inconsistent reasons for denial; fails to investigate a claim adequately or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly; or  by making decisions against the weight of evidence in the record. *Id.* at 968-69.

As to procedural irregularities, the Ninth Circuit applied the same framework in asserting that "[w]hen an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity." *Id.* at 972. However, "[a] more serious procedural irregularity may weigh more heavily." *Id.*

Prior to the September 28, 2010 hearing, the parties disputed whether an abuse of discretion standard of review or a *de novo* standard should apply in this case. According to Lavino's original trial brief, "where an ERISA administrator fails to render a decision on a claim in compliance with the time frames required by the Plan and/or the ERISA Regulations, the claimant is deemed to have exhausted administrative remedies and discretion, if any, is lost." (Pl. Trial Brief at 11). 29 C.F.R. § 2560.503-1(l) codifies that

In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

In Jebian v. Hewlett Packard, 349 F.3d 1098 (9th Cir. 2003), the Ninth Circuit held that an administrator's failure to meet the deadline for a decision – where that deadline is required both by the plan and the applicable regulations – warranted a *de novo* review. As that Court noted, "'deferential review under the "arbitrary and capricious" standard is merited for decisions regarding benefits *when they are made in compliance with plan procedures*.' When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted." Id. at 1105 (quoting Sanford v. Harvard Indus., 262 F.3d 590, 597 (6th Cir. 2001)) (emphasis added in Jebian; see also Abatie, 458 F.3d at 963 ("In general, we review *de novo* a claim for benefits when an administrator fails to exercise discretion."); Gritzer v. CBS, Inc., 275 F.3d 291, 296 (3d Cir. 2002) ("Where a trustee fails to act or to exercise his or her discretion, *de novo* review is appropriate because the trustee has forfeited the privilege to apply his or her discretion . . . . ").

Jebian's impact was significantly dampened, however, in Gatti v. Reliance Standard Life Ins. Co., 415 F.3d 978, 983 (9th Cir. 2005), in which the Ninth Circuit asserted, "[w]e reject Gatti's suggestion that once a benefits administrator has violated the regulation's time limitation, the 'deemed denied' language operates to cut off the administrator's discretion, making *de novo* review appropriate." In

Gatti, the Ninth Circuit was similarly faced with the question of what standard of review to apply when an administrator committed procedural violations. The violations there primarily stemmed from a late decision on the plaintiff's administrative appeal. The Gatti court applied an abuse of discretion standard, finding the plan administrator's late decision to amount to a mere "technical violation." Id. at 984.

Importantly, both the Jebian and Gatti opinions are distinguishable because they hinged on a prior codification of the relevant Code of Federal Regulations. Under the former regulations, claims were "deemed denied" if decisions were untimely. "Excised from the new regulation is the provision that transgressions of time limitations will result in the claim being 'deemed denied.' See 29 C.F.R. § 2560.503-1(h) (2002)." Jebian, 349 F.3d at 1103 n.5.

The question as to whether the removal of the "deemed denied" language from the Code of Federal Regulations effective January 1, 2002 necessarily precludes a de novo review was explicitly reserved by the Ninth Circuit. See Gatti. 415 F.3d at 982 n.1 ("We do not address the question of whether, under the new regulation, claimants who can establish a failure to comply with the claims procedures established by ERISA regulations are entitled to de novo consideration of their claims."). As noted by the Ninth Circuit, the Department of Labor did not explain its reasons for excising the "deemed denied" language, "but did note, in explaining other changes, that section 503 of ERISA was intended 'to assure that claimants whose claims are denied have the ability to take their claims to court without undue delay.'" Id. at 984 (quoting 65 Fed.Reg. 70,246, 70,253 (Nov. 21, 2000)). Nonetheless, the Gatti court asserted "that procedural violations of ERISA do not alter

the standard of review unless those violations are so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm." Id. at 985.

The general inappropriateness of applying a *de novo* standard as a result of procedural irregularities was reemphasized by the Abatie court. There, the Ninth Circuit noted that only in a "rare class of cases" should an administrator's decision to deny benefits be reviewed *de novo*, such as when "an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well." Abatie, 458 F.3d at 971. The only example of this principle that remains instructive under the Supreme Court and Ninth Circuit's current ERISA framework appears to be Blau v. Del Monte Corp., 748 F.2d 1348, 1352 (9th Cir. 1984), *abrogation on other grounds recognized by* Dytrt v. Mountain State Tel. & Tel. Co., 921 F.2d 889, 894 n.4 (9th Cir. 1990). In that case, "the administrator had kept the policy details secret from the employees, offered them no claims procedure, and did not provide them in writing the relevant plan information; in other words, the administrator 'failed to comply with virtually every applicable mandate of ERISA.'" Abatie, 458 F.3d at 971 (discussing Blau, 748 F.2d at 1354). These extensive procedural violations constituted a "substantive harm" on the plan participants that justified a *de novo* review. Blau, 748 F.2d at 1354.

In the aftermath of Gatti, Albatie, and Montour, district courts within the Ninth Circuit have applied an "abuse of discretion tempered with skepticism" standard of review instead of a *de novo* review when procedural irregularities are present. In Prado v. Allied Domecq

Spirits and Wine Group Disability Income Policy, 2010 WL 3119934, *2 (N.D. Cal. 2010), the court found that a tempered abuse of discretion standard would be appropriate despite the fact that the insurance company's benefits decision was untimely by twelve days. Id. at *7. The Prado court distinguished Jebian on the following three grounds: (1) because the delay in Prado was considerably shorter and the good faith correspondence between the parties rendered slight procedural errors inconsequential; (2) because the conduct in Jebian violated both the Code of Federal Regulations and the actual plan, as opposed to just the regulations in Prado (a distinction also noted in Gatti); and (3) because the "deemed denied" language was excised from the regulations subsequent to the Jebian opinion. Id. at *3.

A similar approach was taken in Cushman v. Motor Car Dealers Services, Inc., 652 F.Supp.2d 1122 (C.D. Cal. 2009). Cushman is particularly relevant because in that case a decision on a plan participant's benefits appeal was never rendered by the administrator. Despite the fact that the plan administrator "completely ignored Plaintiff's appeal for more than a year," the court adopted an abuse of discretion standard because the "Defendant's failure to issue a decision on Plaintiff's appeal is not so flagrant that it alters the substantive relationship between the employer and employee as was the case in Blau." Id. at 1129, 1130. Nonetheless, the court applied "a large amount of skepticism when reviewing Defendant's decision to terminate Plaintiff's benefits" due to the conspicuous procedural irregularities found and ultimately determined that the defendant had abused its discretion. Id. at 1130-31, 1135. The Court finds that procedural violations here are closer to the facts in Cushman than in

1  <u>Blau</u>. It cannot be said that MetLife entirely failed to exercise its

2  discretion, which could justify a *de novo* review.

3       Thus, an abuse of discretion standard is appropriate here. Lavino

4  appears to have conceded this point in her latest trial brief, in which

5  she acknowledges that "it would seem the Court shall review for abuse

6  of discretion." (Pl. Supp. Brief at 4). The Court will account for the

7  inherent conflicts of interest and procedural irregularities in this

8  case by "adjust[ing] the level of skepticism with which it reviews a

9  potentially biased plan administrator's explanation for its decision in

10 accordance with the facts and circumstances of the case." <u>Montour</u>, 588

11 F.3d at 631 (citing <u>Abatie</u>, 458 F.3d at 969; <u>Saffon</u>, 522 F.3d at 868).

12 The Court will conduct an abuse of discretion review tempered by a

13 significant amount of skepticism. MetLife's conduct in arriving at its

14 decision has demonstrated various conflicts of interest and substantial

15 procedural irregularities that justify skepticism.

16      Finally, in conducting reviews, courts can consider additional

17 evidence outside the administrative record where appropriate, such as

18 in cases involving procedural irregularities, as here. See <u>Abatie</u>, 458

19 F.3d at 973; <u>Saffon</u>, 522 F.3d 863, 872 n.2 (9th Cir. 2008). In

20 considering such additional evidence, the Court attempts to recreate

21 how the administrative record would have looked absent the

22 irregularities. <u>Id.</u>

23

24 **IV.  Merits Discussion**

25      **A.   Applicable Law**

26      Under traditional abuse of discretion analysis, "[a]n ERISA

27 administrator abuses its discretion only if it (1) renders a decision

28

without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan, 410 F.3d 1173, 1178 (9th Cir. 2005). A plan administrator's decision to deny benefits should be upheld "'if it is based upon a reasonable interpretation of the plan's terms and was made in good faith.'" Id. (quoting Estate of Shockley v. Alyeska Pipeline Serv. Co., 130 F.3d 403, 405 (9th Cir. 1997)). On the other hand, it should be reversed if a review of "the entire record leads to a 'definite and firm conviction that a mistake has been committed.'" Id. at 1179 (quoting Concrete Pipe & Prods. of Cal. Inc. v. Construction Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993)).

In conducting its abuse of discretion analysis, the Court must also consider MetLife's conflicts of interest and the procedural irregularities present in this case. Glenn, 554 U.S. at 117-119. The Court will balance these with other factors such as "the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a records review of the claimant's existing medical records, whether the administrator provided its independent experts 'with all of the relevant evidence[,]' and whether the administrator considered a contrary SSA disability determination, if any." Montour, 588 F.3d at 630 (citing Glenn, 128 S.Ct. at 2352; Saffon, 522 F.3d at 869-73).

In cases involving diseases such as fibromyalgia, where objective measurements of symptoms are difficult to observe, the Ninth Circuit has applied the Cotton test from the Social Securities disability cases. Saffon, 522 F.3d at 872-73, 873 n.3 (discussing Cotton v. Bowen,

799 F.2d 1403, 1407 (9th Cir. 1986) (per curiam)). Under the Cotton

test, a claimant who alleges disability based on subjective symptoms

"must produce objective medical evidence of an underlying impairment

'which could reasonably be expected to produce the pain or other

symptoms alleged . . . . '" Bunnell, 947 F.2d at 344 (quoting 42 U.S.C.

§ 423(d)(5)(A) (1998)); Cotton, 799 F.2d at 1407-08. The Cotton test

thus imposes two requirements on the claimant: (1) she must produce

objective medical evidence of an impairment; and (2) she must show that

the impairment could reasonably be expected to (not that it did in

fact) produce some degree of symptom. Smolen v. Chater, 80 F.3d 1273,

1281-82 (9th Cir. 1996). "If the claimant produces evidence to meet the

Cotton test and there is no evidence of malingering, the [claim

decider] can reject the claimant's testimony about the severity of her

symptoms only by offering specific, clear and convincing reasons for

doing so." Id. at 1281 (9th Cir. 1996).

**B.   Abuse of Discretion**

Benefits cases involving fibromyalgia are thorny in that the

disease's symptoms are difficult to quantify. Diagnoses necessarily

involve subjective determinations as to patients' pain level, often

relying largely on the patients' own accounts. This reality was

discussed at length in Lavino I. There, the Court noted,

> Caselaw suggests that there is no "objective" method for
> measuring pain. In Saffon, the Ninth Circuit quoted its
> Social Security caselaw for the proposition that "disabling
> pain cannot always be measured objectively" and "individual
> reactions to pain are subjective and not easily determined by
> reference to objective measurements." 522 F.3d at 872-73 &
> n.3 (citing Bunnell v. Sullivan, 947 F.2d 341, 348 (9th Cir.
> 1991) (en banc); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir.
> 1989); Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986)
> (per curiam)). This conclusion is supported by a number of
> lower court authorities. Lona v. Prudential Ins. Co. of
> America, No. 07-CV-1276-IEG (CAB), 2009 WL 801868, at *13

(S.D Cal. Mar. 24, 2009); <u>Minton v. Deloitte and Touche USA LLP Plan</u>, 631 F. Supp. 2d 1213, 1219 (N.D. Cal. 2009); <u>Magee v. Metropolitan Life Ins.</u>, 632 F. Supp. 2d 308, 318 (S.D.N.Y. 2009).

MetLife's request for "objective" evidence is particularly problematic in light of the fact that Plaintiff's basic conditions, fibromyalgia and fatigue, are inherently resistant to object verification. In fact, the Ninth Circuit has stated that fibromyalgia is "entirely subjective." <u>Jordan v. Northrop Grumman Corp. Welfare Benefit Plan</u>, 370 F.3d 869, 872 (9th Cir. 2004) ("Fibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia."); <u>see also</u> <u>Benecke v. Barnhart</u>, 379 F.3d 587, 594 (9th Cir. 2004) ("The ALJ erred by effectively requiring 'objective' evidence for a disease that eludes such measurement. Every rheumatologist who treated [plaintiff] diagnosed her with fibromyalgia.") (internal citations and quotations omitted); <u>Lona</u>, 2009 WL 801868, at *13; <u>Minton</u>, 631 F. Supp. 2d at 1219 ("By effectively requiring 'objective' evidence for a disease that eludes such measurement, MetLife has established a threshold that can never be met by claimants who suffer from fibromyalgia, no matter how disabling the pain."); <u>Magee</u>, 632 F. Supp. 2d at 318.

<u>Lavino I</u>, 2010 WL 234817 at *10-11.

Thus, the <u>Cotton</u> test must be applied. Here, Lavino's underlying impairment, fibromyalgia, is undisputed. The only dispute regards the severity of Lavino's symptoms. Looking to the administrative record, the disparity between the observations of Lavino's treating physician and consulting rheumatologist and those of the physician and clinician consulted by MetLife is stark.

Since early 2006, Lavino's disability claim has been confirmed by her long-term treating physician, Dr. Michael Flaningam. Dr. Flaningam diagnosed Lavino with fibromyalgia in June 2006, a few months into his treatment of her, after previously noting her "generalized" and "whole body" pain. (AR 286, 288, 290). Dr. Carolyn Dennehey, a rheumatologist had also examined Lavino in May 2006 and diagnosed her with

fibromyalgia. (AR 303). Dr. Dennehey's examination of Lavino also demonstrated a positive FABER and straight leg test. (AR 303).

As early as January 2007, Dr. Flaningam reported to MetLife, "I'm skeptical she'll ever be able to work on a daily basis or more than several hours straight." (AR 341). In February 2007, Dr. Flaningam reported that Lavino suffered "total body pain in muscles and joints. She is tired all the time and has difficulty concentrating." (AR 307). In May 2007, Dr. Flaningam provided information demonstrating that Lavino had failed on Lyrica, a medication, and that he was "unsure that any medicine will bring about significant relief." (AR 247). He further advised, "Neither of us think she'll be able to work in any capacity by July 1, [2007,] our previous goal, this likely will be at least several months beyond this; we'll therefore set a goal of January 1, 2008." (AR 247-48). In August 2007, Lavino completed a personal profile for MetLife, advising it of her difficulty sleeping, constant joint and muscle pain, and difficulty concentrating and problem-solving. (AR 223). She reported that she would like to return to work "as soon as I can sit in a chair or stand longer than ½ hour w/o pain, as soon as I can carry on a conversation w/o forgetting what we were talking about." (AR 255).

Dr. Flaningam's October 24, 2007 office notes stated, "[Lavino] feels like she is getting worse and thinks its as bad as its ever been. Is in pain all the time, all over," and he renewed his opinion that Lavino could not work. (AR 216-17). In the events leading up to Lavino I, Dr. Flaningam wrote to MetLife again on December 10, 2007 to dispute MetLife's stance that "there was no evidence" of Lavino's inability to work. He inquired as to what evidence was needed to substantiate

Lavino's inability to work. (AR 203). MetLife terminated Lavino's benefits effective January 7, 2008. (AR 195). Lavino appealed by providing MetLife with additional documents from Dr. Flaningam. These documents again outlined her symptoms, physical limitations, and treatment. They also contained a second report from Dr. Dennehey, which recommended additional treatments. Both doctors reconfirmed Lavino's fibromyalgia diagnosis. (AR 181-83, 186-87, 192-93).

The administrative record contains many other observations by Dr. Flaningam (and occasionally by Dr. Dennehey) of the physical pain suffered by Lavino. For example, on January 25, 2008, Dr. Flaningam noted, "As she has had for most of the last 2 years, she continues to have pain that prevents her from day to day activities; typically is worst in her neck or back, but usually also often involves her arms and legs; cannot sit more than 15 minutes w/o having intolerable pain; typically cannot stand or walk for more than 15 minutes w/o intolerable back and leg pains. Also gets mentally exhausted when she has this pain, which is most days. Can't concentrate well, gets dizzy, and sometimes even short of breath." (AR 192). As Dr. Flaningam treated Lavino through the months and years, he checked her tender points several times and prescribed her an assortment of pain and sleeping medications, yet each failed to quell her symptoms. He invariably noted her severe and generalized pain as well as her fatigue, difficulty sleeping, and difficulty concentrating. (AR 159-65, 137, 751, 749, 748, 746, 733, 729-30, 728, 717, 704, 699-700, 675-76).

Dr. Flaningam's notes also discuss Lavino's history of and battle with depression during his treatment, which led him to also refer her to a psychiatrist. At the start of her treatment, Dr. Flaningam was

uncertain as to the cause of Lavino's ailments and did consider

depression as a possible cause. However, after this initial

uncertainty, Dr. Flaningam unequivocally indicated that any depression

that she suffered was intertwined with and a result of her

fibromyalgia. (AR 285-94). For example, Dr. Flaningam asserted in

January 2008 that Lavino's depression is "both **caused by** and

exacerbates her fibromyalgia." (AR 187) (emphasis added). Dr.

Flaningam's notes easily satisfy the second prong of the Cotton test,

as Lavino has shown that her fibromyalgia could both be reasonably

expected to, and in fact did, cause a significant amount of pain that

prevented her from working. Smolen, 80 F.3d at 1281-82.

Dr. Haselwood, who was retained to perform Lavino's recent IME,

painted a very different picture in his report. Dr. Haselwood conducted

an interview and examination of Lavino that lasted one hour and five

minutes. Lavino's husband attended the examination with her. Dr.

Haselwood's report notes that "Ms. Lavino technically demonstrated 18

of 18 fibromyalgia tenderpoints." (AR 831). A diagnosis of fibromyalgia

typically requires a finding of only eleven such tender points. Dr.

Haselwood thus acknowledged that "Ms. Lavino technically meets the

diagnostic criteria for the syndrrome of fibromyalgia as set forth by

the American College of Rheumatology." (AR 833). Although he conceded

that Lavino suffered from fibromyalgia, Dr. Haselwood opined that the

severity of fibromyalgia symptoms cannot be measured objectively in **any**

individual. He stated that "there are no objective physical

abnormalities or clinical tests to define the syndrome of fibromyalgia

or the true level of 'severity' in any given individual." (AR 834). Dr.

Haselwood concluded that Lavino was capable of light duty work.

Dr. Haselwood's report indicates general skepticism about those seeking disability payments as a result of fibromyalgia. He opines:

> The presumption that the syndrome of fibromyalgia inherently predisposes afflicted individuals to unusually severe and permanent levels of physical incapacity is simply not supported by objectively based criteria and is not accepted by the vast majority of community and academically based rheumatologists. As structured by the American College of Rheumatology, the syndrome of fibromyalgia was never intended to be interpreted as an objectively defined pathophysiologic entity for which medical-legal issues of disability could be determined with any semblance of objectivity.
>
> In this context, trying to determine the "severity" of the syndrome of fibromyalgia in the context of "tender point" counts is notoriously manipulative, subjective and misleading. Unfortunately, there are no objective physical abnormalities or clinical tests to define the syndrome of fibromyalgia or the true level of "severity" in any given individual. In the context of noncommittant socioeconomic life stressors and associated depression/anxiety, it is an unreasonable stretch of credibility to presume that a default diagnosis of fibromyalgia can be utilized to objectify the parameters of musculoskeletal impairments.

(AR 833-34). Despite Dr. Haselwood's general viewpoint, courts have nonetheless found the disease to be sufficiently debilitating to justify disability benefits. See, e.g., Lavino I; Morgan, 2010 WL 4665951 at *10; Rudinski v. MetLife, 2007 WL 2746630 (N.D. Ill. Sep. 14, 2007).

Indeed, the very medical entity that retained Dr. Haselwood, MLS, has an assessment of fibromyalgia that differs greatly from that of Dr. Haselwood. MLS has written the following in describing the debilitating nature of fibromyalgia:

> Pain - The pain of Fibromyalgia has no boundaries. People describe it as deep muscular aching, burning, throbbing, shooting and stabbing. . . .
>
> Fatigue - This symptom can be mild in some patients and yet incapacitating in others. The fatigue has been described as "brain fatigue" in which patients are totally drained of energy. Many patients describe this situation by saying that

> they feel as though their arms and legs are tied to concrete
> blocks, and they have difficulty concentrating.
> ...
> Long-term follow-up studies on Fibromyalgia syndrome have
> shown that it is chronic, but symptoms may wax and wane. The
> Impact that FMS can have on daily activities, including the
> ability to work a full-time job, differs among patients.
> Overall, studies have shown that fibromyalgia can be equally
> disabling as rheumatoid arthritis.

(Collins Decl. Exh. 14 at 1, 3).

Although acknowledging that Lavino demonstrated all 18 of the tender points typically associated with fibromyalgia, Dr. Haselwood disclaims its significance, noting, "In the context of this musculoskeletal/soft tissue examination ['during which Lavino demonstrated widespread truncal and extremity soft tissue tenderness'], however, Ms. Lavino's discomfort, guarding and withdrawal mechanisms were inconsistent, variably localized and nonphysiologic." (AR 831). Yet, he does not explain what observations were made during the examination that led him to surmise that Lavino's reactions were "inconsistent" or "nonphysiologic." Thus, Dr. Haselwood's opinions as to possible malingering by Lavino is viewed with some skepticism because he failed to offer "specific, clear and convincing reasons" for reaching any such conclusion. Smolen, 80 F.3d at 1281.

MetLife claims that its decision to limit Lavino's benefits to 24 months under the psychiatric limitation was influenced when Dr. Haselwood's reported that Lavino conceded to being "afflicted with substantial levels of depression." (AR 829). The report further relates that when Lavino was asked whether her depression would "in and of itself" preclude her from working in her former profession, "she and her husband answered in the affirmative." (AR 829). Lavino and her husband vehemently deny ever having made such statements. They contend

that the issue of depression was not even raised until the end of the examination, at which time Lavino acknowledged only that she suffered depression about having to live with fibromyalgia but did not discuss the severity of that depression. (Kelly Lavino Decl. ¶ 7; John Lavino Decl. ¶ 7, Docket nos. 30, 31). Assuming arguendo that Lavino made the statement as reported by Dr. Haselwood, it does not refute Dr. Flaningam's diagnosis that Lavino's depression was caused by fibromyalgia.

The psychiatric review by MetLife's clinician is fraught with similar problems, in addition to the obvious conflicts of interest inherent in MetLife's employing an internal "clinician" to render such an important opinion. Of particularly concern is the fact that the clinician never met with or examined Lavino. Indeed, MetLife's ultimate decision letter confirmed that "there are no clinical records from a mental health provider." (AR 824). Dr. Haselwood's report also comments that Lavino's mental state "is best deferred to a more appropriate psychiatric opinion and it is notable that such records are not available." (AR 834). The clinician herself laments that "there are no clinical records from" a mental health provider. (AR 812). While Lavino had met with a psychiatrist pursuant to Dr. Flaningam's advice on various occasions, no notes from that psychiatrist were available to MetLife for review. In the years that her benefits inquiry was open, MetLife had neither requested them nor indicated that they might be relevant because MetLife never raised the possibility that its decision would be based upon a psychiatric disability. Thus, the basis for any psychiatric determination by MetLife is suspect given the inadequacy of the investigation.

Moreover, the clinician's findings conflict to a significant degree with the opinions of Lavino's treating physician, Dr. Flaningam, who has interacted with Lavino and observed her for years. "[W]here the insured's treating physician's disability opinion is unequivocal and based on a long term physician-patient relationship, reliance on a non-examining physician's opinion premised on a records review alone is suspect and suggests that the insurer is looking for a reason to deny benefits." Morgan, 2010 WL 4665951 at *8. This is of particular importance where the medical determination is psychiatric in nature. "Courts routinely discount or entirely disregard the opinions of psychiatrists who had not examined the individual in question at all or for only a limited time." Sheehan v. MetLife, 368 F.Supp.2d 228, 254 (S.D.N.Y. 2005); See also Westphal v. Eastman Kodak LTD Plan (MetLife), 2006 U.S. Dist LEXIS 41494, at *12-13 (W.D.N.Y. 2006) ("In the context of a psychiatric disability determination, it is arbitrary and capricious to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the claimant"); Morgan, 2010 WL 4665951 at *10. The fact that the clinician does not even appear to be a psychiatrist or psychologist casts further doubt on the clinician's conclusions.

The clinician's report contains very selective references, especially with respect to Dr. Flaningam's notes regarding depression. The report references a notation that Lavino's pain is "somatic and that the major underlying disease was depression." (AR 811). However, Dr. Flaningam's notes to that effect occurred from January to March 2006 when he was first examining Lavino and before she was diagnosed

with fibromyalgia. (AR 285-89). After observing her over those months, Dr. Flaningam determined by June 2006 that Lavino's primary ailment was fibromyalgia and physical in nature. (AR 290). Once formed, he never wavered from that opinion. (See, e.g., AR 292, 294). In fact, Dr. Flaningam's notes in January 2008 state that Lavino's depression was "both **caused by** and exacerbates her fibromyalgia." (AR 187). Yet, the clinician's report does not address this part of Dr. Flaningam's notes. Dr. Flaningam's January 2008 assessment is of particular importance because the "any occupation" determination should have been made by MetLife as of March 2008.

The fact that MetLife first considered this "psychiatric" basis for denying Lavino's benefits only days before trial and several years after she first filed for benefits casts further doubts on the ultimate determination. Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc., 125 F.3d 794, 799 (9th Cir. 1997) (reversing a district court's affirmance of a benefits denial where an administrator took inconsistent positions regarding the claim and reasons for denial); Saffon, 522 F.3d at 872 ("Coming up with a new reason for rejecting the claim at the last minute suggests the claim administrator may be casting about for an excuse to reject the claim rather than conducting an objective evaluation."). Indeed, MetLife had initially granted Lavino benefits due to *physical* disability stemming from fibromyalgia in March 2007. The Court also determined that Lavino had such a *physical* disability in its January Order in Lavino I. In neither proceeding did MetLife raise the possibility that Lavino's disability was psychiatric, despite the fact that they were in possession of Dr. Flaningam's notes that included references to Lavino's depression

dating back to January 2006. (AR 285).

MetLife's last-minute change of heart is especially suspect given the fact that depression is a commonly associated side effect of fibromyalgia. The American College of Rheumatology has noted that "Fibromyalgia is defined by chronic widespread muscular pain and symptoms such as fatigue, sleep disturbances, stiffness, cognitive and memory problems and **symptoms of depression and anxiety**." (Collins Decl. Exh. 15) (emphasis added); see also Lang, 125 F.3d at 799 (noting that fibromyalgia [is] an affliction with a physical source, but which is often accompanied by depression); Morgan, 2010 WL 4665951 at *10 ("Although Morgan may suffer from anxiety and depression, the cause of those symptoms, and, thus, the cause of the disability is fibromyalgia."); Kuhn v. Prudential, 551 F.Supp.2d 413, 432 (E.D.Pa. 2008) (abuse of discretion where "Defendant improperly attempted to 'pigeon hole' Plaintiff into a mental health limitation without properly considering her diagnosis, during the coverage period, of fibromyalgia-like symptoms that over time was confirmed by the consensus of Plaintiff's treating doctors."); Rudinski v. MetLife, 2007 WL 2746630 (N.D. Ill. Sep. 14, 2007).

//

//

//

//

//

//

//

//

32

A review of the record in this case leads the Court to a definite and firm conviction that a mistake has been committed by MetLife. As a result of significant procedural irregularities and conflicts of interest as discussed above, MetLife's decision must be tempered with significant skepticism; accordingly, the Court finds that MetLife's abused its discretion in denying Lavino "any occupation" benefits for her fibromyalgia. MetLife is ORDERED to pay Lavino's "any occupation" benefits in accordance with the terms of the Plan.


        IT IS SO ORDERED.


DATED:_____January 20, 2011_____         _____

                                                        STEPHEN V. WILSON

                                                UNITED STATES DISTRICT JUDGE